IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>BENJAMIN CARL TEDLUND,<br><br>Defendant. | CR 23-50-BLG-SPW<br><br><br>ORDER |

Before the Court is Defendant Benjamin Carl Tedlund's Motion to Suppress. (Doc. 22). Tedlund asks the Court to suppress the firearm and ammunition that law enforcement seized on or about July 11, 2022, because officers did not have reasonable suspicion to stop or seize Tedlund and the search of his backpack was unconstitutional. (Doc. 23).

A hearing was held on September 29, 2023. (Doc. 35). At the hearing, Billings Police Officer Hope Reid and Detective Annalisa Jones testified. The Court finds the material facts are not disputed based on the parties' briefing, Reid's and Jones's testimony, Reid's body camera footage (Doc. 26), Jones's and Officer Donovan's body camera footage (Doc. 30),[1] the police reports (Doc. 24), and the filings in the related state court case (Docs. 29-1, 33-1).

---

[1] The Government filed two videos, one from Donovan's body camera and one from Jones's body camera. (Doc. 30). The Court will reference the footage from Donovan's body camera as Doc. 30A and the footage from Jones's body camera as Doc. 30B.

1

For the following reasons, the Court denies Tedlund's motion.

## I.    Factual Background

On July 11, 2022, Reid was dispatched to 627 N 26th Street in Billings,

Montana, on a report of a man on private property who the caller wanted moved.

(Doc. 24 at 5).  The caller had contacted police earlier that day to report the same

man.  Reid found the man asleep in a patch of grass between the street and off-

street parking, and told him he needed to move.  (Doc. 26 at 1:00–20).  The man

said he was fine staying where he was.

As Reid tried to get the man to move, an unidentified woman and another

man, later identified as Tedlund, walked up.  (*Id.* at 1:15–30).  The woman said she

knew the man on the ground.  Reid responded that the man could not sleep there

but that he could go to North Park.  Tedlund told Reid the man needed his walker,

to which she responded that she did not take it or know where it was.  Tedlund

repeated that the man needed his walker, while Reid repeated that he needed to

move.  At one point, in reference to the man needing his walker, Tedlund said,

"Not sure if you heard me or not," to which Reid responded loudly, "I heard you.

Do you need to step off somewhere else?"  The conversation continued:

> Tedlund:    You don't need to scream. I pay your bills.
> Reid:       No you don't, 'cus you probably don't pay taxes.
> Tedlund:    Judgmental bitch, c'mon.

(*Id.* at 2:40).

2

At this point, Tedlund and the woman had lifted the man to his feet and were trying to help him walk. The man was barely able to move but slowly inched forward. As the three moved away from Reid, Tedlund muttered, "get away from this devil, demon, bitch." Tedlund continued to walk with the man and woman away from Reid. Tedlund looked back at Reid, and the two said the following:

| | |
|---|---|
| Tedlund: | Kidding me? |
| Reid: | No, I'm not. Because this is private property. |
| Tedlund: | Fucking bat out of the devil, bitch …fuck…. |
| Reid: | Okay, we can keep going and I'll just arrest you for disorderly conduct. |
| Tedlund: | Shut the fuck up, I pay you to shut the fuck up. |
| Reid: | No, fucking keep walking. |

(*Id.* at 3:12). After a brief pause, Reid said, "The only other thing I can do for him is get him an ambulance." (*Id.* at 3:21). The three continued to the end of the block at the corner of North 26th Street and 7th Avenue North. Officer Reid remained at about the spot where she initially contacted the man. (*Id.* at 4:15).

As the three turned right at the intersection, Tedlund started to say various, mostly inaudible things. When he left the view of Reid's bodycam, Tedlund yelled, "Fuck off now. Let me tell you twice, I pay your bills bitch." (*Id.* at 4:21–26). Reid immediately started walking toward them and shouted back, "Hey, if you want a disorderly conduct charge I can do it." They both continued yelling:

| | |
|---|---|
| Tedlund: | Shut the fuck up. This guy needs help. |
| Reid: | Yeah, I can't help him. |
| Tedlund: | Shut the fuck up. |

3

(*Id.* at 4:30–35).

Reid approached Tedlund and said, "Do we have an issue? Is this going to continue to be an issue?"  Tedlund responded,

| Tedlund: | Yeah, fucking help him out, bitch. |
| Reid: | No, that's not my job. |

(*Id.* at 4:44).  The two kept shouting at each other, and Reid grabbed Tedlund's upper left arm with her right arm.  Tedlund repeatedly yelled, "You ain't tough, you're inferior," then, "This guy needs help."  (*Id.* at 4:50–5:00).  As Tedlund spoke, Reid said three times, "Do you want another issue?"  Reid also grabbed Tedlund's left forearm with her left arm, then demanded his name.  Tedlund replied, "My name is Benjamin Tedlund. Stop it dude, yo," then the two separated. (*Id.* at 5:00–05).  Reid wrote in her report that he "ripped away" from her, (doc. 24 at 2, 5), but then testified that he was "not necessarily ripping away at [that] point." Instead, she described him as "passive aggressively pulling away" and having made "physical efforts to get away from [her]."  She testified that she did not believe she could have held onto him.  Reid also testified that people were standing outside the residences nearby watching the incident.

Tedlund ran down the street away from Reid, looking back over his right shoulder, then his left, and then his right again.  (Doc. 26 at 5:05–10).  Reid testified and wrote in her reports that when he looked over his right shoulder the second time, he had pulled out a gun and racked it.  Reviewing the video during

the hearing, Reid testified she saw the gun at timestamp 5:08. She also testified that she heard the gun rack. It is not clear from the body camera footage whether Tedlund had a gun.

Within seconds, as Tedlund continued to run, Reid began breathing heavily and pulled out her gun. (*Id.* at 5:12). She radioed to other officers that a man wearing shorts, a t-shirt, and a blue backpack with a gun was running westbound. (*Id.* at 5:14–30). The woman can be heard yelling, "Don't shoot him, don't shoot him, he doesn't have a gun, he doesn't have a gun." (*Id.* at 5:15–20). Reid shouted back, "He just pulled a gun. Shut up." (*Id.* at 5:20–22). On the sidewalk about where Reid said she saw Tedlund pull out the gun, Reid picked up what she later reported to be a cell phone. (*Id.* at 5:35–48). She radioed that she was not going to pursue Tedlund and walked toward North Park. Reid testified that, during the encounter, she was scared, anxious, and nervous because it was the first time she ever had a gun pulled on her.

About 10 minutes later, Officer Donovan spotted a man matching the description Reid had given of Tedlund in North Park. (Doc. 30A at 9:10; Doc. 24 at 7). He commanded Tedlund to get on the ground. (Doc. 30A at 9:18–30). Tedlund complied, laying on his stomach face down, and officers handcuffed him. (*Id.* at 9:30–10:37). While Tedlund was handcuffed and still on the ground, Detective Jones opened the backpack on Tedlund's back and immediately saw the

handle of a machete and a handgun. (*Id.* at 10:49–53; Doc. 30B at 9:43–47).

Jones handed the gun to Officer Cook and directed the other officers to take the

backpack off Tedlund. (Doc. 30B 10:14–11:21). The backpack was handed to a

nearby officer. Officers then searched Tedlund's person.

Cook safety checked the gun. (Doc. 24 at 9). No round was in the chamber,

but the magazine was loaded with nine 9mm rounds. Cook secured the gun and

backpack in the trunk of his patrol vehicle. While tagging the contents of the

backpack into evidence, Cook found another magazine loaded with ten 9mm

rounds and a box of 25 rounds of ammunition. Tedlund was booked at the

Yellowstone County Detention Facility.

On July 13, 2022, Tedlund was charged in the Montana Thirteenth Judicial

District Court in Yellowstone County with Assault with a Weapon and Obstructing

a Peace Officer in violation of Montana Code Annotated §§ 45-5-213(1) and 45-7-

302, respectively. (Doc. 33-1). Tedlund agreed to plead guilty to two

misdemeanor charges, Obstructing a Peace Officer and Resisting Arrest in

violation of §§ 45-7-302 and -301, respectively, in exchange for the dismissal of

the felony assault charge. (Doc. 29-1; Doc. 33-1 at 5). He received credit for time

served and was released from custody on January 18, 2023.

On April 20, 2023, Tedlund was charged in this Court with Prohibited

Person in Possession of a Firearm and Ammunition in violation of 18 U.S.C.

§ 922(g)(1) and Possession of a Stolen Firearm in violation of 18 U.S.C. § 922(j).

(Doc. 1).

## II.    Legal Standard

### A.    Investigative Stops

The Fourth Amendment prohibits unreasonable searches and seizures.  U.S.

Const. am. IV.  Under *Terry v. Ohio*, 392 U.S. 1 (1968), a police officer may

conduct a brief, investigative stop of an individual if the officer has reasonable

suspicion that the "person apprehended is committing or has committed a criminal

offense." *Arizona v. Johnson*, 555 U.S. 323, 326 (2009).  Montana codified *Terry*

in Montana Code Annotated § 46-5-401 (2021).[2]  Under Montana Code Annotated

§ 46-5-401(2)(a), the officer may, among other investigatory acts, request the

person's name during the *Terry* stop.

The Court examines the "totality of the circumstances" to determine whether

a detaining officer has a "particularized and objective basis" for suspecting

criminal wrongdoing.  *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal

quotation marks omitted).  The officer must have specific, articulable facts which,

together with objective and reasonable inferences, form a basis for suspecting that

a particular person is engaged in criminal conduct.  *United States v. Thomas*, 211

---

[2] The Montana Code was updated in 2023, and the changes will go into effect on January 1, 2024.  Because the offense conduct occurred on July 11, 2022, prior to the updates, the Court will apply the language of the code as it existed at the time of the offense instead of the interim changes.

F.3d 1186, 1189 (9th Cir. 2000). "The quantum of proof needed for reasonable

suspicion is less than a preponderance of evidence and less than probable cause."

*United States v. Tiong*, 224 F.3d 1136, 1140 (9th Cir. 2000).

B. *Warrantless Arrest*

Law enforcement may only arrest a person with a warrant or, if in public, if

they have "probable cause to believe that a criminal offense has been or is being

committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). "There is probable

cause for a warrantless arrest and a search incident to that arrest if, under the

totality of the facts and circumstances known to the arresting officer, a prudent

person would have concluded that there was a fair probability that the suspect had

committed a crime." *United States v. Gonzales*, 749 F.2d 1329, 1337 (9th Cir.

1984). "[P]robable cause 'demands' factual 'specificity' and 'must be judged

according to an objective standard,'" *United States v. Johnson*, 256 F.3d 895, 905

(9th Cir. 2001) (quoting *Terry*, 392 U.S. at 21–22 n. 18), considering "the nature

and trustworthiness of the evidence of criminal conduct available to the police,"

*Beier v. City of Lewiston*, 354 F.3d 1058, 1064 (9th Cir. 2004).

C. *Warrantless Search*

Under the Fourth Amendment, law enforcement must have a warrant to

search a person. U.S. Const. am. IV. However, a variety of exceptions exist. One

well-established exception is search incident to arrest. *United States v. Cook*, 808

F.3d 1195, 1199 (9th Cir. 2015).  "This exception allows an officer to search 'the arrestee's person and the area within his immediate control,' defined as 'the area from within which he might gain possession of a weapon or destructible evidence.'" *Id.* (quoting *Chimel v. California*, 395 U.S. 752, 763 (1969)).

If a search is conducted without a warrant absent an exception to the warrant requirement, then the evidence discovered through the "exploitation of" the illegal search must be suppressed as "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).  A variety of exceptions to the fruit of the poisonous tree doctrine exist which allow for admission of evidence derived from official misconduct.  The relevant exceptions here are the attenuated basis and inevitable discovery exceptions.  *See United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1396 (9th Cir. 1989).

## III.  Analysis

### A.  Reasonable Suspicion to Stop Tedlund

The parties first dispute whether Reid had reasonable suspicion to effectuate an investigatory stop on Tedlund when she grabbed him.  The Court finds she did.

Under Montana law, a person commits the offense of disorderly conduct if (1) the person knowingly disturbs the peace by, in part, making "loud or unusual noises," or using "threatening, profane, or abusive language," and (2) in the course of disturbing the peace, "a peace officer recognizes the person's conduct creates an

articulable public safety risk." Mont. Code Ann. § 45-8-101. "The language of the disorderly conduct statute prohibiting use of 'threatening, profane, or abusive language' has been construed to apply only to 'fighting words.'" *City of Billings v. Nelson*, 322 P.3d 1039, 1044 (Mont. 2014) (citing Mont. Code Ann. § 45-8-101(1)(c); *Montana v. Robinson*, 82 P.3d 27, 29 (Mont. 2003)). "Fighting words" are "'those which by their very utterance inflict injury or tend to incite an immediate breach of the peace.'" *City of Whitefish v. O'Shaughnessy*, 704 P.2d 1021, 1024 (Mont. 1985) (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571 (1942)). Fighting words are characterized by their "tendency to provoke a violent response in the listener." *Nelson*, 622 P.3d at 1044–45.

The Montana Supreme Court repeatedly has held that profanities directed at law enforcement are considered fighting words that can constitute a violation of the disorderly conduct statute (or municipal analogues). In *Robinson*, the Montana Supreme Court held that Robinson violated the state's disorderly conduct statute when he loudly called an officer a "fucking pig" and told him to "fuck off, asshole," in front of other pedestrians. 82 P.3d at 28–29, 31. In *O'Shaughnessy*, the court found that O'Shaughnessy used fighting words when he told a police officer "Well, motherfucker, I will holler and yell when and whenever I want to," in response to the officer telling him and his friends to quiet down because they were yelling near several apartments. 704 P.2d at 1023–24.

Tedlund generally argues that he did not commit disorderly conduct and thus Reid's *Terry* stop was not justified because "he did not threaten Officer Reid or seek physical conflict." (Doc. 23 at 18). The Government asserts Tedlund engaged in disorderly conduct, so as to justify a *Terry* stop, because he "yell[ed] profanity multiple times on a residential street late at night." (Doc. 29 at 8).

The Court finds Tedlund committed disorderly conduct, and because Reid personally witnessed him engage in such conduct, she had reasonable suspicion to effectuate the *Terry* stop. First, it is undisputed that Tedlund spoke and yelled insulting profanities at Reid similar to those found to have violated the disorderly conduct statute in *O'Shaughnessy* and *Robinson*. (*See* Doc. 26 at 2:30–5:05; Doc. 23 at 6–9; Doc. 29 at 4–5). As to Tedlund's argument that he did not threaten or seek physical conflict, Tedlund did not cite nor could the Court find a case where such physical confrontation was required for disorderly conduct. In fact, neither of the defendants in *O'Shaughnessy* or *Robinson* were described as threatening or physically confronting the officers, yet still were convicted of disorderly conduct.

Second, Tedlund's conduct disturbed the peace because, as Reid testified, he made the above-quoted remarks, sometimes very loudly, in a quiet residential neighborhood in front of people standing nearby who already had called police about trespass and disturbance issues. *See City of Billings v. Batten*, 705 P.2d 1120 (Mont. 1985) (finding the defendant guilty of disorderly conduct when the

11

profanities he yelled in a quiet residential neighborhood caught the attention of a small number of people).

Tedlund argues he did not commit disorderly conduct because his speech was protected by the First Amendment, particularly because Reid is a member of law enforcement. (Doc. 23 at 17–18). The Government argues that the Court need not address the First Amendment issue because Reid is entitled to reasonable mistakes of law. (Doc. 29 at 8).

The Government is correct that law enforcement is entitled to reasonable mistakes of law in determining if reasonable suspicion exists to conduct a *Terry* stop under *Heien v. North Carolina*, 574 U.S. 54 (2014). Further, the First Amendment does not protect Tedlund's speech, even though he was yelling at a police officer. *Robinson* rejected the Ninth Circuit's standard in *United States v. Poocha*, 259 F.3d 1077 (9th Cir. 2001) that officers "'may reasonably be expected to exercise a higher degree of restraint than the average citizen[.]'" 82 P.3d at 30 (quoting *Poocha*, 259 F.3d at 1081). In explaining its rejection of the *Poocha* standard for the use of fighting words against law enforcement, the Montana Supreme Court wrote:

> If the statements in question had been uttered in the context of a political rally or protest, free speech concerns might well prevail. However, we fail to see how randomly goading a police officer by calling him a "f* * * * * * pig" adds to our constitutionally-protected social discourse. It is one thing to expect peace officers to exercise more restraint than the average citizen. However, it is quite another to allow the likes of [the defendant] to

12

gratuitously test that restraint without fear of being charged with disorderly conduct.

*Id.* at 31. Thus, unlike in the Ninth Circuit, calling a cop a "fucking pig" under Montana law equates to fighting words, is not protected speech, and is properly punishable under the state's disorderly conduct statue. *Id.* Since Tedlund's speech was similarly profane to that in *Robinson*, the Court adopts *Robinson*'s logic on the inapplicability of the First Amendment here.[3]

Tedlund attempts to distinguish *Robinson* by noting that Tedlund was "continually moving away from the officer during the encounter." (Doc. 33 at 7). However, this fact only pertains to Tedlund's first encounter with Reid, not his second encounter with her. Tedlund does not address how any of his actions negated his profane language—and the higher volume at which he spoke them—during his second encounter.

Additionally, *Robinson* renders the fact that Tedlund was moving away from Reid irrelevant. In *Robinson*, Robinson never moved toward the officer; rather the officer approached him. First, Robinson called the officer a "fucking pig" while on the sidewalk as the officer sat in his patrol car at a red light. 82 P.3d at 28. The officer then pulled up to Robinson, parked his car, and walked to him. *Id.*

---

[3] Montana law applies to the Court's First Amendment analysis because the disorderly conduct allegation is made pursuant to state and not federal law. Reid was operating pursuant to state law in assessing if Tedlund committed disorderly conduct, and therefore state law governs.

Robinson then told the officer to "[f]uck off, asshole." *Id.* at 29. A similar

scenario occurred here between Tedlund's first and second encounters with Reid:

Tedlund called Reid various names, she reapproached him, they made physical

contact, and he yelled more profanities at her.

Accordingly, the Court finds Reid had developed reasonable suspicion that

Tedlund had committed disorderly conduct and was authorized to briefly stop him.

During the stop, Reid was authorized under Montana law to ask his name as part of

her investigation. Mont. Code Ann. § 46-5-401(2)(a).

B.    *Probable Cause to Arrest Tedlund*

The parties next dispute whether Tedlund's arrest in North Park was

constitutional. The Government argues that officers had probable cause to arrest

Tedlund for disorderly conduct, obstructing a police officer, and resisting arrest.

(Doc. 29 at 14). Tedlund initially was charged with assault with a weapon based

on Reid's belief that Tedlund pulled a gun out and racked it while running away

from her. (Doc. 33-1).

An officer's "reason for making the arrest need not be the criminal offense

as to which the known facts provide probable cause." *Devenpeck*, 543 U.S. at 153.

Thus, that Tedlund was charged with assault with a weapon, as opposed to

disorderly conduct, obstructing a police officer, and resisting arrest, does not limit

the Court's analysis to assault with a weapon. The Court will analyze whether

probable cause existed for each alleged offense.

### 1.        Obstructing a Peace Officer and Resisting Arrest

A person obstructs a peace officer in violation of Montana Code Annotated

§ 45-7-302(1) if they "knowingly obstruct[], impair[], or hinder[] the enforcement

of the criminal law, the preservation of the peace, or the performance of a

governmental function, including service of process." A person resists arrest if

they "knowingly prevent[] or attempt[] to prevent a peace officer from effecting an

arrest by: (a) using or threatening to use physical force or violence against the

peace officer or another; or (b) using any other means that creates a risk of causing

physical injury to the peace officer or another." Mont. Code Ann. § 45-7-301(1).

Tedlund argues he did not obstruct a peace officer or resist arrest because he

complied with Reid's only command (to give her his name), and Reid did not

attempt to stop or arrest Tedlund after they separated and he started to run. (Doc.

23 at 19–20; Doc. 33 at 10). The Government disagrees, arguing that Tedlund

obstructed a peace officer and resisted arrest because he fled from Reid's efforts to

stop him from walking away, pulled out a gun, and racked it. (Doc. 29 at 17).

The Court finds probable cause did not exist to arrest Tedlund for

obstruction of a peace officer because an investigation was not ongoing, and

Tedlund did not engage in obstruction. As to the investigation, when Tedlund and

15

Reid separated, the only crime Tedlund could have been suspected of was disorderly conduct. Reid already had witnessed Tedlund yelling profanities and had acquired Tedlund's name, so she did not have anything left to investigate. Thus, no investigation existed for Tedlund to obstruct.

Even if Reid was investigating Tedlund, he did not engage in obstruction. Tedlund complied with the only command Reid gave him—to give her his name. Reid did not tell him he was under arrest, or tell him to stop before or after he ran. The only time Reid exercised physical control over Tedlund was when she grabbed his arm and wrist. However, the parties agree that this was not a seizure. (*See* Doc. 23 at 19–20; Doc. 29 at 11). Thus, it cannot be said that Reid had detained Tedlund, such that their separation would constitute Tedlund disobeying an implicit command and that him running would constitute fleeing.

Additionally, whether Tedlund overcame Reid's physical control—indicating he refused to comply with an implicit command—is not clear from the record due to inconsistencies in Reid's accounts. Reid wrote in her report that he "ripped away" from her, but then testified that he was "not necessarily ripping away at this point." Instead, according to Reid's testimony, he "was passive aggressively pulling away" from her and made "physical efforts to get away from" her. She said did not believe that she could have held onto him at that point but also never stated she was trying to hold onto him. Notwithstanding the fact that

16

the Court does not know what "passive aggressively pulling away" means, Reid's other descriptions of Tedlund's actions are too inconsistent and vague for the Court to conclude Tedlund obstructed Reid in any way.

Probable cause to arrest Tedlund for resisting arrest also did not exist because Reid never effectuated or attempted to effectuate an arrest. Again, she only grabbed onto Tedlund for a couple seconds, never stated he was under arrest, and never attempted, verbally or physically, to stop him after they separated.

2.     *Disorderly Conduct*

The Court already has discussed at length why Reid had reasonable suspicion that Tedlund had committed disorderly conduct. For the same reasons, it finds that she had probable cause that he committed disorderly conduct. Again, she personally witnessed him yell profanities and the subsequent public disruption it caused.

As to Tedlund's First Amendment defense, the Ninth Circuit and Supreme Court have not decided whether law enforcement is entitled to mistakes of law in ascertaining probable cause. Some circuit and district courts have extended *Heien*'s reasonable mistake of law protection to probable cause analyses. *Sinclair v. Lauderdale County*, 652 F. App'x. 429, 435 (6th Cir. 2016); *Cahaly v. Larosa*, 796 F.3d 399, 408 (4th Cir. 2015); *United States v. Hawkins*, 830 F.3d 742, 746 (8th Cir. 2016); *J Mack LLC v. Leonard*, No. 2:13-cv-808, 2015 WL 519412, at *9

(S.D. Ohio Feb. 9, 2015); *United States v. Diaz*, 122 F. Supp. 3d 165, 174–75

(S.D.N.Y. 2015); *Dunlap v. Anchorage Police Dep't*, No. 3:10-cv-00242, 2016

WL 900625, at *4–*5 (D. Alaska Mar. 8, 2016) (discussing caselaw). *But see*

*Flint v. City of Milwaukee*, 91 F. Supp. 3d 1032, 1058 (E.D. Wis. 2015) ("[T]he

Court has qualms about even applying *Heien* here, given that this is not a

reasonable suspicion case.").

The Court need not decide whether the mistake of law doctrine applies to the

probable cause analyses because, again, under Montana law, the First Amendment

would not protect Tedlund's speech.  Thus, Tedlund's defenses against the charge

are unsuccessful.  Reid had developed probable cause that Tedlund committed

disorderly conduct, and law enforcement had probable cause to arrest him.[4]

### 3.      *Assault with a Weapon*

A person commits assault with a weapon "if the person purposely or

knowingly causes bodily injury to another with a weapon, or reasonable

apprehension of serious bodily injury in another by use of a weapon or what

reasonably appears to be a weapon."  Mont. Code Ann. § 45-5-213(1).  "[A]

person's reasonable apprehension of serious bodily injury is an objective standard;

i.e., whether a reasonable person would feel apprehensive when faced with the

---

[4] The arresting officers did not need to have personal knowledge of the facts supporting probable cause so long as Reid did. "Where law enforcement authorities are cooperating in an investigation, the knowledge of one is presumed shared by all." *United States v. Jensen*, 425 F.3d 698, 704 (9th Cir. 2005) (internal quotation marks and citation omitted).

conduct complained of." *Montana v. Michelotti*, 420 P.3d 1020, 1027 (Mont. 2018).

The parties mainly dispute whether there is sufficient evidence to demonstrate that Tedlund pulled out and racked a firearm when he ran away from Reid. Tedlund argues that the body camera footage is too unclear and Reid's accounts of the events are too inconsistent for the Court to conclude that Tedlund pulled out a gun. (Doc. 23 at 20–22). The Government contends that Reid's accounts are not inconsistent with one another or the body camera footage, and demonstrate she reasonably believed Tedlund pulled out and racked a gun while running from her. (Doc. 29 at 15–17).

The Court finds the evidence demonstrates that there was a fair probability that Tedlund pulled out and racked a firearm, and that such actions would have instilled a reasonable apprehension of serious bodily injury in Reid. Though the body camera footage is too blurry to tell if Tedlund pulled out a firearm, the video demonstrates that, seconds after Tedlund supposedly pulled out and racked a gun, Reid started breathing heavily, pulled out her gun, and radioed to the other officers that Tedlund had taken out and racked a firearm. The immediacy of her actions in relation to Tedlund's indicates that she was acting reflexively and based solely on her observations, rather than on any analysis or reflection. Additionally, Reid testified that she was sure she heard a gun rack because the sound of a gun racking

is so unique that it would not be confused with another sound, like, for instance, Tedlund's phone hitting the ground. The Court finds Reid's testimony on this topic particularly credible because the firearms training she completed with the Billings Police Department and military police have familiarized her with the sound of a racking gun. Last, Tedlund was found with a gun on his person less than an hour later. Though the gun was in his backpack and not in his hand, he had enough time between his interaction with Reid and his arrest to put it in his backpack.

Even if Tedlund had not pulled out and racked a firearm, probable cause to arrest based on a mistake of fact is constitutional so long as the mistake is "reasonable." *Heien*, 574 U.S. at 61. Here, Reid made a split-second determination based on her visual and auditory observations that Tedlund had pulled out and racked a gun. Given her experience and training, it is not unreasonable for her to make such an inference.

As for whether Tedlund's conduct placed Reid in reasonable apprehension of bodily harm, Reid testified that she was scared, anxious, and nervous during the encounter, particularly because it was the first time she had ever had a gun pulled on her. The video affirms this. Reid was breathing heavily and deployed her firearm. It is reasonable for a person to become fearful when a person with whom

they are in conflict pulls out a gun, particularly if that person has never had a gun pulled on them.

Thus, probable cause existed to arrest Tedlund for assault with a weapon.

C.    *Constitutionality of the Search*

Tedlund asserts that even if his arrest was constitutional, the search of his backpack was not because no exigency existed to support the warrantless search. (Doc. 23 at 23–24). Because, according to Tedlund, the search was unconstitutional, the fruits of the search—the gun and ammunition—must be suppressed. (*Id.*). The Government disagrees, arguing that the search incident to arrest exception applies. (Doc. 29 at 18–21).

"In evaluating the reasonableness of a search incident to arrest, we have examined not only whether the area searched was within the arrestee's 'immediate control,' but also whether any event occurred after the arrest that rendered the search unreasonable." *Cook*, 808 F.3d at 1199 (quoting *United States v. Maddox*, 614 F.3d 1046, 1048 (9th Cir. 2010)). "While '[t]here is no fixed outer limit for the number of minutes that may pass between an arrest and a valid, warrantless search,' *United States v. McLaughlin*, 170 F.3d 889, 892 (9th Cir. 1999), we have said that the search must be 'spatially and temporally incident to the arrest,' *United States v. Camou*, 773 F.3d 932, 937 (9th Cir. 2014)." *Id.* *See also United States v. Smith*, 389 F.3d 944, 951 (9th Cir. 2004) (per curiam) (interpreting the temporal

requirement to mean that the search must be "roughly contemporaneous with the arrest").

In *Cook*, officers ordered the defendant onto the ground at gunpoint and handcuffed him. 808 F.3d at 1197. While he was still on the ground and within one or two minutes of his arrest, one of the officers picked up a backpack located next to Cook and conducted a 20 to 30-second search for weapons or contraband. *Id.* The court found the search constitutional because it occurred immediately after his arrest, was very brief, and stopped as soon as the officer confirmed it contained no weapons. *Id.* at 1199–1200. Additionally, the backpack was "easily within reaching distance" of Cook. *Id.* at 1200 (internal quotation omitted). That he was in handcuffs and face down on the ground did not negate the "possibility that Cook could break free and reach for a backpack next to him." *Id. Cf. Arizona v. Gant*, 556 U.S. 332, 338 (2009) (search of Gant's car was unreasonable because Gant was locked inside of a patrol car and not within reaching distance of the car).

The situation here mirrors that in *Cook*. Tedlund was ordered to the ground on his stomach in North Park and handcuffed. The backpack was in his immediate control even though he was handcuffed because it was still on his person and the

possibility existed that he could break free and access it.  The search occurred 15 seconds after his arrest and was brief.[5]

Tedlund attempts to distinguish *Cook* on the grounds that *Cook* involved "considerable evidence of criminality and concerns for officer safety," whereas here, the evidence of the firearm here was speculative.  (Doc. 33 at 13).  The Court already has determined that there was a fair probability that Tedlund had a gun.  Thus, officers had reason to believe that the backpack might contain a gun.  Further, Tedlund was arrested in a public place where public safety is an inherent concern.  *Cf. United States v. Guzman-Guerrero*, No. 2:15-CR-96, 2016 WL 10951813, at *3 (E.D. Wash. Mar. 2, 2016) (finding search of backpack incident to arrest unreasonable, in part, because agents had arrested the defendant in a remote location and had no reason to believe it contained a gun).  Last, contrary to Tedlund's assertion that Tedlund may not have been arrested and booked had they not found the gun, officers had probable cause to arrest him on disorderly conduct.

Accordingly, because Tedlund's arrest was constitutional and the officers acted according to the search incident to arrest exception, the search was constitutional, and suppression of the firearm is not warranted.

---

[5] It also seems that Tedlund consented to a search of "everything" after officers found the gun and machete.  (Doc. 30B at 9:56–10:00 (Tedlund saying "Search everything, search everything, I give you consent.")).

D.    *Discovery of Firearm Pursuant to an Exception to the Fruit of the Poisonous Tree Doctrine*

The Government also contends that officers would have constitutionally obtained the firearm even if the search was unconstitutional under two theories: the attenuation and inevitable discovery exceptions to the fruit of the poisonous tree doctrine. Though the Court already has found the stop, arrest, and search of Tedlund constitutional, it will briefly discuss these arguments.

1.    *Attenuation Exception*

The attenuation exception "applies when the connection between the illegality and the challenged evidence has become sufficiently weak so as to dissipate the taint caused by the illegality." *Ramirez-Sandoval*, 872 F.2d at 1396 (citing *Wong Sun*, 371 U.S. at 488). A defendant's "intervening independent act of free will" may be sufficient to attenuate a constitutional violation. *Wong Sun*, 371 U.S. at 486. In evaluating whether the connection between the constitutional violation and subsequently discovered evidence is sufficiently attenuated to "purge" the "taint," the Court considers "the temporal proximity" of the officer's illegal conduct and the evidence in question, "the presence of intervening circumstances," and "the purpose and flagrancy of the official misconduct." *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975).

Here, no intervening circumstances existed because Tedlund did not engage in an intervening act. Unlike other instances where defendants flee from a lawful

24

seizure, Tedlund neither fled from Reid because she did not detain or seize him, nor disobey any of her commands. Additionally, he did not commit any new offenses, nor pose a risk to public safety while fleeing on foot. *Cf. United States v. Zamora*, CR 23-20-BLG, 2023 WL 5097098, at *4 (D. Mont. Aug. 9, 2023) (finding that the attenuation doctrine justified Zamora's arrest because his high-speed vehicular flight constituted a "new distinct crime and posed serious risk to public safety"); *United States v. Allen*, 619 F.3d 518, 526 (6th Cir. 2010) (denying suppression where the defendant tried to escape by leading officers on a high-speed chase, which "constituted a new, distinct crime"); *United States v. Boone*, 62 F.3d 323, 324 (10th Cir. 1995) (denying suppression where vehicular flight posed serious risks to public safety). Thus, the attenuation doctrine does not apply and would not independently justify the search of Tedlund.

> 2.      *Inevitable Discovery Exception*

The Government also argues that the inevitable discovery doctrine would apply because the gun would have been found during routine inventory of Tedlund's backpack at the jail when Tedlund was booked. The inevitable discovery exception applies if, "by following routine procedures, the police would inevitably have uncovered the evidence[.]" *United States v. Young*, 573 F.3d 711, 721 (9th Cir. 2009) (internal quotation omitted). "It is not unreasonable for police, as part of the routine procedure incident to incarcerating an arrested person, to

25

search any container or article in his possession, in accordance with established inventory procedures." *United States v. Andrade*, 784 F.2d 1431, 1433 (9th Cir. 1986) (internal quotations and citation omitted).

Based on *Andrade*, this exception applies here because Tedlund was validly arrested and booked in the jail for assault with a weapon. The gun in Tedlund's backpack would have been found during routine inventory when he was booked since his backpack was on his person. Suppression is not warranted.

## IV. Conclusion

For these reasons, Reid had reasonable suspicion to effectuate a *Terry* stop on Tedlund, officers had probable cause to arrest Tedlund, and officers were justified in searching his backpack incident to his arrest. Even if the search of his backpack was unconstitutional, the firearm would have been found pursuant to routine booking procedures at the jail.

IT IS SO ORDERED that Defendant Benjamin Carl Tedlund's Motion to Suppress (Doc. 22) is DENIED.

DATED this 24th day of October, 2023.

Susan P. Watters

SUSAN P. WATTERS
United States District Judge